**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**PHILLIP A. GAUDETTE, JR.,**

                              **Plaintiff,**

    **vs.**                                      **1:11-cv-932**
                                               **(MAD/RFT)**

**SAINT-GOBAIN PERFORMANCE PLASTICS**
**CORPORATION, SAINT-GOBAIN PERFORMANCE**
**PLASTICS, YALE MATERIALS HANDLING**
**CORPORATION d/b/a YALE, and NACCO**
**MATERIALS HANDING GROUP, INC.,**

                              **Defendant.**

_____

**SAINT-GOBAIN PERFORMANCE PLASTICS**
**CORPORATION,**

                              **Cross-Claimant,**

    **vs.**

**YALE MATERIALS HANDLING**
**CORPORATION d/b/a YALE, and NACCO**
**MATERIALS HANDING GROUP, INC.**

                              **Cross-Defendants.**

_____

**SAINT-GOBAIN PERFORMANCE PLASTICS**
**CORPORATION,**

                              **Third-party Plaintiff,**

    **vs.**

**FEDEX FREIGHT, INC. as successor in interest to**
**FEDEX FREIGHT SYSTEM, INC. and**
**FEDEX NATIONAL, LTL, INC.,**

                              **Third-party Defendant.**

_____

**APPEARANCES:**                            **OF COUNSEL:**

**CONWAY & KIRBY, LLP**              **ANDREW W. KIRBY, ESQ.**
9 Cornell Road
Latham, New York 12110
Attorneys for Plaintiff

**PHILLIPS LYTLE LLP**                **PRESTON L. ZARLOCK, ESQ.**
3400 HSBC Center                        **RICHARD T. TUCKER, ESQ.**
Buffalo, New York 14203
Attorneys for Defendant-Cross-Claimant-
Third-Party Plaintiff
Saint-Gobain Performance Plastics Corporation

**GOLDBERG SEGALLA LLP**          **JOHN P. FREEDENBERG LLP**
665 Main Street, Suite 400
Buffalo, New York 14203
Attorneys for Defendant-Cross-Defendant
NACCO Materials Handling Group, Inc.

**WEBER GALLAGHER SIMPSON**     **JEFFREY A. SEGAL LLP**
**STAPLETON FIRES & NEWBY LLP**
405 Lexington Avenue, 26th Floor
New York, New York 10174
Attorneys for Third-Party Defendant
FedEx Freight, Inc.

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

In his Amended Complaint, Plaintiff Philip A. Gaudette, Jr. alleges causes of action

against Defendants in negligence, strict tort liability, and breach of express and implied

warranties.  *See* Dkt. No. 12.  Defendant-Cross-Claimant-Third-Party Plaintiff Saint-Gobain

Performance Plastics Corporation ("Saint-Gobain")[1], in its Answer to Amended Complaint with

Counter-Claims, seeks contractual indemnification, common law indemnification, and common

---

[1] Saint-Gobain was incorrectly sued as Saint-Gobain Performance Plastics Corporation
and Saint-Gobain Performance Plastics.

law contribution from Defendants-Cross-Defendant Yale Materials Handling Corporation and NACCO Materials Handling Group, Inc. (collectively, "NMHG")[2]. *See* Dkt. No. 15. Saint-Gobain has also filed an Amended Third-Party Complaint against Plaintiff's employer, FedEx Freight, Inc., as successor in interest to FedEx Freight System, Inc. and FedEx National, LTL, Inc. ("FedEx"), alleging causes of action for contractual indemnification and contribution, common law indemnification, and common law contribution. *See* Dkt. No. 35. Presently before the Court are the following motions: NMHG's motion to preclude the expert testimony of Saint-Gobain's expert Dennis Eckstine and for summary judgment and dismissal of all claims against it, *see* Dkt. No. 55; FedEx's motion for summary judgment and dismissal of Saint-Gobain's contract-based claims against it, *see* Dkt. No. 59; and Saint-Gobain's motion to strike portions of FedEx's reply memorandum of law in support of its motion for summary judgment, or for leave to file a sur-reply, *see* Dkt. No. 65.

## II. BACKGROUND[3]

### A.    The forklift and accident at issue

On May 11, 2009, Plaintiff sustained injury to his left foot while on the premises of Saint-Gobain's facility in Hoosick Falls, New York. Dkt. No. 55-1, NMHG's Statement of Material Facts ("NMHG SOMF") ¶ 15. At the time of his injury, Plaintiff was employed as a driver for FedEx, and was making a delivery to Saint-Gobain in that capacity. *Id.* ¶ 16. The material delivered by Plaintiff to Saint-Gobain was positioned on pallets or skids, which were offloaded from his trailer by use of a forklift truck. *Id.* ¶ 17; Dkt. No. 55-8 ("Gaudette Dep.") at 66-68. The

---

[2] NMHG was incorrectly sued as Yale Materials Handling Corporation d/b/a Yale and NACCO Materials Handling Group, Inc.

[3] The following facts are undisputed, or indisputable, unless otherwise noted.

forklift truck used by Saint-Gobain to offload Plaintiff's trailer that day was a Yale-branded forklift truck with Model Number ESC025F4S071 (the "Yale Forklift"). Dkt. No. 12 ("Amended Complaint") ¶ 13; Dkt. No. 15 at ¶ 8.

Timothy Morin was the Saint-Gobain shipping and receiving employee who operated the Yale Forklift during the offloading of pallets delivered by Plaintiff on May 11, 2009. NMHG SOMF ¶ 18. In order to offload the pallets from Plaintiff's FedEx truck, the width of the forks on the Yale Forklift had to be widened to accommodate the position of a certain pallet. *Id.* ¶ 19; Gaudette Dep. at 75-78. Plaintiff and Mr. Morin positioned themselves on opposite ends of the fork carriage, which is the lateral piece of metal to which the forks were attached. NMHG SOMF ¶ 20; Gaudette Dep. at 78. The fork carriage was elevated between two and three feet from the floor of the trailer. NMHG SOMF ¶ 22; Gaudette Dep. at 172; Dkt. No. 55-10 ("Morin Dep.") at 35. When Plaintiff pulled on one of the forks, it came off the fork carriage and landed on his left foot. NMHG SOMF ¶ 21; Gaudette Dep. at 83, 89-90.

During the twenty-eight years Mr. Morin worked at Saint-Gobain, he had never seen or reviewed the operator's manual for the Yale Forklift. NMHG SOMF ¶ 24. At the time of the accident, Mr. Morin was not familiar with the instruction sticker mounted in the operator's compartment of the Yale Forklift, and had never seen a device called a load backrest extension ("LBE")[4] on the Yale Forklift. NMHG SOMF ¶ 25-26; Morin Dep. at 24-25, 121.

Christopher McGlynn was hired by Saint-Gobain as a maintenance engineer in June 2008, with responsibilities for daily maintenance of the facility and its equipment. NMHG SOMF ¶ 30.

---

[4] A load backrest extension is a rack-like extension that, when affixed to the fork carriage, can prevent the load from shifting backward when the carriage is lifted to the full height of the mast. For illustrative purposes only, attached as Figure 1 is a diagram which identifies the common features of a forklift truck. Attached as Figure 2 is an image of the Yale Forklift at issue, as reflected in its sales brochure. *See* Dkt. No. 55-15 at 13.

Prior to the accident at issue, Saint-Gobain did not have an operator's manual for the Yale Forklift, but Mr. McGlynn had read the Yale Forklift's warning stickers. NMHG SOMF ¶¶ 31, 33; Dkt. No. 55-11 ("McGlynn Dep.") at 9-10, 24. Mr. McGlynn was aware that the Yale Forklift was not equipped with an LBE prior to the accident. NMHG SOMF ¶ 34; McGlynn Dep. at 26. Mr. McGlynn was familiar with industry standards which provided that an end user should not modify original equipment installed on a forklift without approval from the manufacturer. NMHG SOMF ¶ 35; McGlynn Dep. at 28-29.

David Romero is an engineer who was employed by Yale as a test engineer and stress analyst, who was involved in the testing of the prototype for Yale Forklift at issue. NMHG SOMF ¶ 40. As part of his team's work on the Yale Forklift at issue, Mr. Romero had responsibility for testing its compliance with industry standards and regulations, including those promulgated by the American National Standards Institute ("ANSI") and Underwriters Laboratory ("UL"), as well as Occupational Safety and Health Administration ("OSHA") regulations. NMHG SOMF ¶ 41; Dkt. No. 55-12 ("Romero Dep.") at 16-17. The Yale Forklift was manufactured in 1977. NMHG SOMF ¶ 42.

At issue in NMHG's motion for summary judgment is the load backrest extension or LBE. The parties agree that an LBE was standard equipment with the Yale Forklift, NMHG SOMF ¶ 50, but their agreement ends there. NMHG contends that the LBE served two safety purposes: to prevent loads from falling back on the operator and to prevent the forks from coming off the fork carriage. *Id.* ¶ 44. NMHG states that the controlling ANSI standard at the time the Yale Forklift was manufactured required that manufacturers provide a means to fix forks laterally on the fork carriage, and that this standard was satisfied through the use of pins and notches along the top edge of the fork carriage and the LBE. *Id.* ¶ 45. It is beyond dispute that the LBE does fit on the

fork carriage in such a way as to prevent the forks from coming off the fork carriage. NMHG SOMF ¶ 46; Romero Dep. at 30, 140-41. It is also beyond dispute that the Yale Forklift's on-product label advises that it "should be equipped with over-head guard and load backrest. Use extreme care if operating conditions prevent use of over-head guard and load backrest." NMHG SOMF ¶ 52; Dkt. No. 56-16. Mr. Romero also testified that Yale expected that the Yale Forklift would be operated from time-to-time without the LBE. Romero Dep. at 77, 143-44. Saint-Gobain disputes that the Yale Forklift's LBE was designed for the purpose of protecting against the risk of forks falling off the fork carriage. Dkt. No. 56-1 ("Saint-Gobain SOMF") ¶ 44. Saint-Gobain also contends that the Yale Forklift was designed with no other safety features to prevent the forks from coming off the fork carriage. Saint-Gobain SOMF ¶¶ 46-48.

**B.      The Saint-Gobain-FedEx Transportation Services Agreement**

On or about November 26, 2007, Saint Gobain and FedEx entered into a Transportation Services Agreement. Dkt. No. 59-1, FedEx's Statement of Material Facts ("FedEx SOMF") ¶ 11; Dkt. No. 59-11, Transportation Services Agreement ("TSA"). On May 11, 2009, Plaintiff sustained an injury to his left foot while at the Saint-Gobain facility in Hoosick Falls, New York. FedEx SOMF ¶ 17. At the time of his injury, Plaintiff was making a delivery within the scope of his employment at FedEx. *Id.* ¶ 16 (duplicate). Saint-Gobain employee Timothy Morin was operating the Yale Forklift during the offloading of the pallets Plaintiff was delivering to Saint-Gobain at the time of his injury. *Id.* ¶ 17 (duplicate). On December 30, 2009, Saint-Gobain sent a letter to FedEx demanding a defense and indemnification from FedEx pursuant to the TSA. *Id.* ¶ 13. FedEx has denied Saint-Gobain's demand for defense and indemnification. *Id.* ¶ 14.

Section 16 of the TSA provides:

> **(16)  INDEMNIFICATION**. Carrier and Customer (each an "Indemnifying Party") shall each indemnify, defend and hold

harmless the other, including their respective officers, directors, agents, employees and parent, sister and other affiliated companies, from and against any and all, claims, demands, losses, damages, costs and expenses (including reasonable attorney's fees, costs and expenses incidental thereto), connected with or resulting from injury to or death of any person; injury to property (excluding Customer's cargo), or to natural resources; violation of any local, state or federal law or regulation; or strict liability imposed by any law or regulation, arising out of the Indemnifying Party's (or its employees' or agents') negligent acts or omissions or willful misconduct or violation of any law or regulation, in connection with this Agreement, provided that the party seeking indemnification gives the Indemnifying Party (i) prompt written notice of any such claim; (ii) sole authority and control over the defense and/or settlement of such claim; and (iii) at the Indemnifying Party's request, such reasonable assistance and information as is available for the defense of such claim. In no event will either party be liable for consequential, indirect, exemplary or special damages.

TSA ¶ 16.  The TSA states that it shall be interpreted in accordance with the laws of the state of Tennessee.  FedEx SOMF ¶ 12; TSA ¶ 25.

## III. DISCUSSION

**A.**      **NMHG's motion to preclude Mr. Eckstine's testimony**

**1.**      ***Mr. Eckstine's qualifications and opinions***

Dennis Eckstine is an engineering design professional with over twenty-five years of experience in the field of safe design and use of construction, industrial, and agricultural equipment.  Dkt. No. 55-17 ("Eckstine Report") ¶ 2.  He has a bachelor's degree in mechanical engineering and a masters in business administration, and has held senior positions in the engineering, quality and product safety departments of three different manufacturers of industrial equipment.  *Id.* ¶¶ 3-4.  During his twenty-five year career at Grove Worldwide, Mr. Eckstine worked on the design and product safety of Grove's products including cranes, aerial work platforms, lift trucks and other materials handling equipment.  Dkt. No. 55-18 ("Eckstine Dep.") at 7-10.  He has been a member of several professional organizations in this field, including ANSI

and ISO.  Eckstine Report ¶ 5.  For the last ten years, Mr. Eckstine has worked for a consulting firm he founded, Eckstine and Associates.  In that capacity, Mr. Eckstine has been retained as a testifying expert in over twenty cases in federal and state court over the last four years.  *Id.* ¶ 6, Exh. B.  Mr. Eckstine has never been precluded from testifying as an expert in a federal court. Eckstine Dep. at 5.

Mr. Eckstine's report opines that the Yale Forklift, as designed, posed a substantial likelihood of harm as a result of the forks falling off the carriage beam when they were adjusted to widen their placement.  Eckstine Report ¶ 17.  Mr. Eckstine's report further opines that there are three feasible design alternatives that would have reduced or prevented the harm sustained by Plaintiff here: (1) an LBE secured in place by a locking mechanism, so that it would likely only be removed when the forks were completely removed from the carriage beam; (2) a carriage beam design that only permitted the removal of the forks from the center of the carriage beam; and (3) a "fork stop" device affixed to the top of the carriage beam that would have prevented the forks from falling off the carriage beam while the Yale Forklift was being operated without an LBE. *Id.* ¶ 46.  Mr. Eckstine is also of the opinion that the defective design of the Yale Forklift was a substantial factor in causing Plaintiff's injury, and that NMHG failed to properly warn of the risk of operating the Yale Forklift without the LBE in place (because such was foreseeable and expected by NMHG).  *Id.* ¶ 55, 62. Mr. Eckstine's opinions are based upon the following:  the custom and standard of practice in the fields of safe design and use of construction, industrial, and agricultural equipment, and his twenty-five years of experience in those fields; the documents listed in Exhibit D of his Report; and a physical inspection of the Yale Forklift on August 29, 2012. *Id.* ¶ 10.

    **2.**    ***NMHG's position***

NMHG argues that the opinions of Saint-Gobain's proffered expert, Mr. Eckstein, "should be precluded both because he lacks qualification relevant to the design of the product at issue, and his opinions are based on nothing more than unsupported speculation and subjective belief." Dkt. No. 55-2 at 12. Despite his degree in engineering, Saint Gobain contends that Mr. Eckstine "lacks specialized knowledge or training relevant to the design of forklift trucks or their operation in the workplace." *Id.*

In support of its argument that Mr. Eckstine is not qualified, NMHG notes that Mr. Eckstine formerly worked at Grove Worldwide, which is a manufacturer of cranes, aerial work platforms, and other products, but that Grove manufactured forklift trucks for only a limited period during the 1980s. Although Mr. Eckstine volunteered to be a liaison on the International Organization for Standardization's technical committee for industrial trucks, he is not a member of the ANSI standard committee for industrial trucks, and has never published any papers on forklift trucks. *See id.* at 12-13.

NMHG also points out that Mr. Eckstine has inspected only the Yale Forklift at issue, and thus, has never inspected a Yale Forklift with an LBE in place. Nor did Mr. Eckstine conduct a study of different designs used by manufacturers of LBEs for forklift trucks, particularly whether other manufacturers bolt their LBEs in place as he suggests in his expert report. *See id.* at 13.

NMHG also claims that Mr. Eckstine's opinions contradict established industry and government regulations and standards. In sum, Saint-Gobain asserts that "Mr. Eckstine lacks qualification regarding forklift trucks in general, and regarding the Yale [F]orklift [ ] in particular, to allow him to provide reliable opinion testimony to the jury in this action." *See id.* at 12-13.

In support of it's argument that Mr. Eckstine's opinions are insufficiently reliable, NMHG asserts that his "opinions are entirely conclusory and would not assist the jury in this case." Dkt.

No. 55-2 at 14.  NMHG notes that Mr. Eckstine has admitted:  that the Yale Forklift complied with then-applicable industry standards and that those standards did not require the redundant alternative design features he advocates; that the LBE would have prevented this accident if it were in place; and that the product literature and warnings alert the operator to the necessity of using the LBE.  Moreover, NMHG argues that he has done no testing and can cite no peer-reviewed literature showing that his proposed alternative designs would be more likely to prevent this accident than the original safety features provided by the manufacturer.  *See id.* at 14.

Moreover, NMHG argues that Mr. Eckstine has no specialized knowledge about forklift trucks and that he failed to educate himself about forklift trucks or the components relevant to this dispute.  Further, NMHG asserts that Mr. Eckstine did no research regarding the design and warning practices of other manufacturers with regard to the forklift components at issue here.  Finally, NMHG suggests that Mr. Eckstine's Report was drafted by counsel for Saint-Gobain and that his methodology was simply a reiteration of the legal conclusions supplied by counsel.  *See id.* at 14-15.

### 3. *Saint-Gobain's position*

Saint-Gobain contends that each of NMHG's arguments go to the weight, not the admissibility, of Mr. Eckstine's opinions.  First, Saint-Gobain argues that Mr. Eckstine is sufficiently qualified to render the opinions set forth in his Report.  Saint-Gobain disputes NMHG's assertion that Mr. Eckstine should be precluded from testifying because he lacks experience in designing forklifts.  Saint-Gobain contends that Mr. Eckstine's extensive engineering experience with industrial equipment, in particular his career at Grove Worldwide and his work as a consultant for the last fifteen years, render him qualified as an expert to testify regarding the design of the Yale Forklift.  Moreover, Saint-Gobain argues that Mr. Eckstine's

membership in and/or role as liaison to several industry standardization organizations further bolster his qualifications. *See* Dkt. No. 56-2 at 7-8.

Saint-Gobain next argues that any "perceived gaps in a professional engineer's qualifications or knowledge about a specific type of product generally affect the weight of the witness's testimony, not its admissibility." *Id.* at 8. Saint-Gobain contends that NMHG's objections to Mr. Eckstine's qualifications are merely based upon his lack of experience with the Yale Forklift at issue, and in particular his failure to inspect an exemplar model with an LBE installed. Saint-Gobain asserts that Mr. Eckstine's experience in the field of mechanical engineering and design safety, together with his physical inspection of the Yale Forklift at issue (as well as its design documents, product manuals, and applicable industry standards), are a sufficient foundation to render his testimony admissible. *See id.* at 9.

Finally, Saint-Gobain argues that Mr. Eckstine's opinions regarding feasible alternative designs is supported by sufficient evidence. Saint-Gobain asserts that in a products liability suit, peer review, publication, and testing of an expert's opinions are not dispositive. *See id.* at 10 (citing cases). Moreover, Saint-Gobain contends that an expert may establish a feasible alternative design through either testing and construction of a prototype or by identifying manufacturers of similar equipment who have put such an alternative design into use. *See id.* (citing *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003)). According to Saint-Gobain, Mr. Eckstine observed that prior to the manufacture of the Yale Forklift at issue, NMHG had begun the design process of changing its forklifts so that the LBE would be secured in place with screws to prevent its removal and the forks would be center loaded, as he proposes. Further, Mr. Eckstine identified several examples of "fork stops" in use in the industry, which

prevent forks from falling off the end of a carriage beam where the LBE has been removed. *See id.* at 11.

### 4. *Plaintiff's position*

Plaintiff takes no position with respect to NMHG's motion to preclude the expert testimony of Saint-Gobain's expert, Dennis Eckstine. *See* Dkt. No. 57-2 at 4.

### 5. *Analysis*

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. That Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)). The rule set forth in *Daubert* applies to scientific knowledge, as well as technical or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (alterations, quotations, and citations omitted). The court must also consider the fact that "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Committee's Note; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266 (citation omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks

13

good grounds for his or her conclusions.'" *Id.* (quotation and citation omitted). Accordingly, "gaps or inconsistencies" in an expert's reasoning, or arguments that an expert's conclusions are wrong, "go to the weight of the evidence, not to its admissibility." *Campbell v. Metropolitan Property and Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001). Likewise, disputes regarding the nature and strength of an expert's credentials, an expert's use or application of his methodology, or the existence or number of supporting authorities for an expert's opinion, go to the weight, not the admissibility of his testimony. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

As the courts and Advisory Committee have made clear, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini v. 71st Lexington Corp.*, No. 07 Civ. 701(JCF), 2009 WL 413608, *5 (S.D.N.Y. Feb. 13, 2009) (quoting *Amorgianos*, 303 F.3d at 267). As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking an expert who has applied a valid methodology in reaching his or her opinions." *Daubert*, 509 U.S. at 596.

Courts are wary of awarding summary judgment where there are conflicting expert reports. *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Rand v. Volvo Fin. N. Am.*, 2007 WL 1351751, at *3 (E.D.N.Y. 2007) ("It is not for the court to decide which expert opinion is more persuasive."). It would be improper for a court to engage in a "line by line" examination and comparisons of the conflicting expert opinions. The jury must make a

determination regarding the credibility of all expert witnesses. *See Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment.").

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *accord Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).[5] Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146.

Contrary to NMHG's assertions here, a review of Mr. Eckstine's Report and deposition transcript makes clear that his opinions and testimony are sufficiently reliable and based on

---

[5] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert testimony that was speculative and unreliable was properly not considered by the district court on summary judgment); *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) (noting that "[a]n otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert (1) qualified his opinions, (2) failed to support his opinions with any methodology which the court could analyze, and (3) rested his opinions "upon nothing more than subjective belief and unsupported speculation").

sufficient facts, and that he is sufficiently qualified to testify to those opinions at trial. According to Mr. Eckstine, in reaching his conclusions, he physically inspected the Yale Forklift at issue, reviewed deposition transcripts and other case materials, and researched applicable industry standards and practices. As noted above, Mr. Eckstine has extensive experience in the mechanical engineering field, particularly with respect to the design, use, and safety of cranes, lifts, and materials handling equipment. Moreover, he is affiliated with several professional organizations, including those with responsibility for standards pertaining to forklift trucks.

While many of NMHG's arguments regarding Mr. Eckstine's opinions and qualifications are sensible, they simply go to the weight of the testimony and do not provide a basis for exclusion. *See, e.g.*, *Demar v. D.L. Peterson Trust*, No. 1:05-cv-103, 2006 WL 2987314, *5 (N.D.N.Y. Oct. 13, 2006). Mr. Eckstine's opinions rest on a sufficiently reliable foundation and are relevant to the issues presented, such that they are admissible under the flexible *Daubert* standard. *See Amorgianos*, 303 F.3d at 265 (citation omitted); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (holding that the Supreme Court in *Daubert* "expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable") (citation omitted). Moreover, the Court is unpersuaded by NMHG's argument that Mr. Eckstine's lack of experience with forklift trucks generally, and in particular the Yale Forklift at issue here, warrants exclusion of his testimony. *See Wasilewski v. Abel Womack, Inc.*, No. 3:10CV1857, 2014 WL 819498, *3 (D. Conn. Mar. 3, 2014) (finding that plaintiff's expert, who was "a mechanical engineer with experience with material handling equipment and safety analysis," including lifts, was a "qualified expert as to forklift design, injury analysis and causation"); *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (holding that "[t]he question is not whether the

engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive experience"). Mr. Eckstine's credentials clearly demonstrate that he is sufficiently qualified to testify as an expert in this case, in the manner proposed.

Based on the foregoing, the Court finds that Mr. Eckstine's opinions are based on sufficient data related to the Yale Forklift and accident in question, and are sufficiently grounded in his engineering discipline so as to justify their admission. As such, the Court denies NMHG's motion to preclude Mr. Eckstine's testimony.

**B.      NMHG's motion for summary judgment**

NMHG argues that it is entitled to summary judgment on each of Plaintiff's claims and Saint-Gobain's cross-claims against it. Several of NMHG's arguments are predicated on its motion to preclude the expert testimony of Mr. Eckstine, which motion the Court has denied for the reasons set forth above. NMHG nevertheless contends that, even with the benefit of Mr. Eckstine's testimony, neither Plaintiff nor Saint-Gobain can meet their respective burdens of proof on their negligence and strict products liability claims. NMHG also asserts that Plaintiff's breach of warranty claims are time-barred and therefore should be dismissed. With respect to Saint-Gobain's cross-claim for contractual indemnity, NMHG argues that it is entitled to summary judgment because Saint-Gobain has not produced the purchase order upon which that claim is based.

**1.      *Standard of review***

A court may grant a motion for summary judgment only if it "determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*,

43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. *Products liability claims*

As an initial matter, NMHG asserts that it is entitled to summary judgment on Plaintiff's products liability claims, because he has not proffered an expert opinion sufficient to prove that the Yale Forklift was defective. *See* Dkt. No. 55-2 at 15. While Plaintiff takes no position with respect to NMHG's motion to preclude the testimony of Saint-Gobain's expert, Mr. Eckstine, Plaintiff does rely on Mr. Eckstine's opinions in arguing that there are genuine issues of material fact. *See* Dkt. No. 57-2 at 8, 11. In reply, NMHG acknowledges that Plaintiff has adopted the

opinions of Mr. Eckstine (in part), but does not appear to argue that such reliance is impermissible.  *See* Dkt. No. 58 at 7.

The Court is not aware of any precedent which would bar Plaintiff from relying on Mr. Eckstine's opinions to defeat NMHG's motion for summary judgment.  *See DG&G Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826-27 (8th Cir. 2009) (rejecting appellant's argument that appellee should not have been permitted to use the report of an expert retained by a settling party and noting that appellant had "cite[d] no authority prohibiting the use of another party's expert report for summary judgment purposes").  There is, however, a split of authority regarding whether such a practice is permissible at trial where the witness would not otherwise be called to testify.  *See House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 238 (N.D. Iowa 1996) (describing split of authority on "the vexing and surprisingly little explored question of whether one party should be able to depose or call at trial an expert designated by an opposing party as expected to be called at trial, but whom the designating party has announced it will not call at trial"); *cf. Nichols v. Am Risk Mgmt. Inc.*, No. 89Civ.2999(JSM)(AJP), 2000 WL 97282 (S.D.N.Y. Jan. 28, 2000) (holding that the plaintiff could use the deposition testimony of a settling defendant's expert at trial against a remaining defendant).  In any event, this is not the issue before the Court.  The issue here is whether Plaintiff may rely on the opinions of Defendant Saint-Gobain's testifying expert, as reflected in the expert's report and deposition testimony, in order to defeat a motion for summary judgment.  The Court is persuaded by the reasoning of those courts that have considered this issue in the analogous context of reliance upon another party's expert reports and deposition testimony at trial and concluded that such reliance is permissible.  *See, e.g.*, *Kerns v. Pro–Foam of So. Ala., Inc.*, 572 F. Supp. 2d 1303, 1311 (S.D. Ala. 2007) (noting that "courts have repeatedly observed that once a party has given testimony

through deposition or expert reports, those opinions do not 'belong' to one party or another, but rather are available for all parties to use at trial"); *Penn Nat. Ins. Co. v. HNI Corp.*, 245 F.R.D. 190, 193-94 (M.D. Pa. 2007) (holding that one party may rely at trial upon the testimony of another party's expert witness where that expert witness and his report have been, via a Rule 26(b)(2) designation, brought within the universe of material discoverable by all parties). Having concluded that Mr. Eckstine's opinions are admissible, and that Plaintiff may rely on those opinions, the Court now turns to the substance of NMHG's motion.

"In New York, a plaintiff injured by an allegedly defective product may seek recovery against the manufacturer on the basis of any one or more of four theories of liability," including contract (express or implied), negligence, strict products liability, and breach of warranty (express or implied). *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983) (citing *Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395 (1975)). Although the available defenses and applicable limitations principles of the various liability theories differ, there can be "a high degree of overlap between the substantive aspects" of the causes of action. *Denny v. Ford Motor Corp.*, 87 N.Y.2d 248, 256 (1995) (citation omitted). New York courts generally consider strict products liability and negligence claims to be "functionally synonymous." *See Pinello v. Andreas Stihl Ag and Co. KG*, No. 8:08 Civ. 00452, 2011 WL 1302223, *16 (N.D.N.Y. May 31, 2011).

Established New York law holds "that 'the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages; provided (1) that at the time of the occurrence the product is being used . . . for the purpose and in the manner normally intended, (2) that if the person injured or damaged is himself the user of the product he would not by the exercise of reasonable care have both discovered the defect and perceived its danger, and (3) that by the exercise of reasonable care the person injured

or damaged would not otherwise have averted his injury or damages.'" *Voss*, 59 N.Y.2d at 106 (quoting *Codling v. Paglia*, 32 N.Y.2d 330 (1973)). A manufacturer may be liable under strict products liability for defective products based on a "manufacturing flaw, improper design or failure to warn." *Sukljian v. Charles Ross & Son Co., Inc.*, 69 N.Y.2d 89, 94 (1986) (citations omitted). At issue here are Plaintiff's direct claims and Saint-Gobain's cross-claims under the design defect and failure to warn theories.

### a.    *Defective design*

In order to prove a design defect claim, the same *prima facie* case is required under both negligence and strict liability theories. *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62-63 (2d Cir. 2002) (citing *Denny*, 87 N.Y.2d at 248) ("In general, the strict liability concept of 'defective design' is functionally synonymous with the earlier negligence concept of unreasonable designing.") (citation omitted). In particular, the decisive question for both strict liability and negligent design causes of action is whether the evidence establishes that the product "was 'not reasonably safe' as *Voss* defines the term." *Adams v. Genie Indus. Inc.*, 14 N.Y.3d 535, 543 (2010). To establish a *prima facie* case based on design defect, "'the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.'" *Id.* at 542 (quotation omitted).[6] Whether a product "is not reasonably safe" has been described as follows: "'whether . . . if the design defect were known at the time of the

---

[6] "In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way. In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process. In the latter class of cases, the flaw alone is a sufficient basis to hold the manufacturer liable without regard to fault." *Denny*, 87 N.Y.2d at 257 n.3 (citation omitted).

manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner.'" *Id.* (quoting *Voss*, 59 N.Y.2d at 108). Therefore, to succeed on this claim, Gaudette and Saint-Gobain must establish that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing Plaintiff's injury. *See Voss*, 59 N.Y.2d at 108 (citation omitted).

A finding of such liability requires the jury to balance the risks of using the product in its present condition against the product's risks and costs, and against the risks, usefulness and costs of using the alternative design instead of the one creating the alleged defect. *See Denny*, 87 N.Y.2d at 257 (citation omitted). In balancing the inherent risks of a product as designed, against its utility and cost, the following factors may be considered:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product – that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Voss*, 59 N.Y.2d at 109 (citations omitted). The showing of a feasible, alternative design is a *sine qua non* of a design defect claim. *Morritt v. Stryker Corp.*, No. 07-CV-2319, 2011 WL 3876960, *6 (E.D.N.Y. Sept. 1, 2011) (citing *Voss*, 59 N.Y.2d at 107).

"[U]nder New York law, a plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs. The only exception to this rule is if a reasonable alternative design is both obvious to and understandable

by a layperson." *Soliman v. Daimler, AG*, No. CV 10-408(SJF)(AKT), 2011 WL 6945707, *5

(E.D.N.Y. Aug. 8, 2011) (citations and quotations omitted).  As one court has stated:

> Proof of a safer alternative design can consist either of (1) an expert demonstrating, through testing and construction of a prototype, that an alternative is feasible, practical, economical, and safe; or (2) an expert identifying manufacture[r]s of similar equipment that have put the proposed design into use.  *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003).  Despite this standard, there is no specific evidence a plaintiff must submit, although "unsupported, conclusory evidence on the technological and economic feasibility of a safer design is insufficient." *Ferracane v. United States*, No. 02-CV-1037, 2007 WL 316570, *5 (E.D.N.Y. Jan. 30, 2007) (quoting *G.E. Capital Corp. v. A.O. Smith Corp.*, No. 01 Civ. 1849, 2003 WL 21498901, *4 (S.D.N.Y. July 1, 2003) (internal quotations omitted).

*Mathis-Kay v. McNeilus Truck & Mfg., Inc.*, No. 06-CV-815S, 2011 WL 4498386, *7 (W.D.N.Y.

Sept. 27, 2011).

NMHG argues that, even if Mr. Eckstine is permitted to testify, the defective design

claims fail because Gaudette and Saint-Gobain cannot "establish that the Yale forklift truck

presented a substantial likelihood of harm as designed."  Dkt. No. 55-2 at 18.[7]  NMHG also

argues that it is entitled to dismissal of the design defect claims because Saint-Gobain's removal

of the LBE was a "substantial modification" under *Robinson v. Reed-Prentice*, 49 N.Y.2d 471

(1980).  *See* Dkt. No. 55-2 at 19.  Further, NMHG claims that Mr. Eckstine's opinions fail to

---

[7] To the extent that NMHG argues that Gaudette and Saint-Gobain were themselves negligent, *see, e.g.*, Dkt. No. 55-2 at 18, and therefore cannot establish that the defective design was a substantial factor in causing Plaintiff's injury, NMHG has failed to meet its burden. "Plaintiffs need not prove that the defective design is the sole proximate cause of [their] injury. Rather, 'in order to prevail at the summary judgment stage, *the defendant* must show that the plaintiff's conduct was the 'sole proximate cause of his or her injuries.'" *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 45 (E.D.N.Y. 2010) (quoting *Donald v. Shinn Fu Co.*, No. 99-CV-6397, 2002 WL 32068351, *6 (E.D.N.Y. Sept. 4, 2002)).  NMHG's arguments go to the issue of contributory negligence and will be resolved by a jury at trial.

establish a feasible alternative design or that his proposed alternative designs would have prevented Plaintiff's injuries. *See id.* at 20.

Contrary to NMHG's assertions, Gaudette and Saint-Gobain have created questions of fact as to the design defect claims that preclude summary judgment. Specifically, Mr. Eckstine stated in his report that the Yale Forklift, "as designed, posed a substantial likelihood of harm of the forks falling off the Forklift's carriage beam when they were adjusted to widen their placement on the Forklift's carriage." Eckstine Report ¶ 17. Further, Mr. Eckstine stated that the LBE was easily removable and purposely designed to be removable so that the Yale Forklift would have greater versatility in its operation in circumstances where there was low overhead clearance. *Id.* ¶¶ 34, 42. Moreover, Mr. Eckstine stated that NMHG designed the LBE without a physical mechanism locking it in place, and that NMHG cannot produce documentation to show that the LBE was designed for the purpose of protecting against the risk of forks falling off the carriage beam. *Id.* ¶¶ 33, 35.

In addition, Mr. Eckstine has offered opinions regarding three proposed alternative designs, which he opines would have prevented Plaintiff's injuries: (1) an LBE secured in place by a locking mechanism, so that it would likely only be removed when the forks were completely removed from the carriage beam; (2) a carriage beam design that only permitted the removal of the forks from the center of the carriage beam; and (3) a "fork stop" device affixed to the top of the carriage beam that would have prevented the forks from falling off the carriage beam while the Yale Forklift was being operated without an LBE. Eckstine Report ¶ 46. As to the locking mechanism, Mr. Eckstine states that NMHG changed the design of the LBE for its forklifts in 1979 to incorporate such a mechanism in order to prevent the removal of the LBE. *Id.* ¶ 50. Mr. Eckstine also states that the "center load and unload" design was common in the industry in 1975.

24

*Id.* ¶ 51. With respect to "fork stops," NMHG's own expert testified that one of its competitors was using this feature in its forklifts as early as 1975. *See* Dkt. No. 56-16, at 51-57.

To the extent NMHG's own expert disagrees with Mr. Eckstine and offers conflicting opinions that the Yale Forklift was safe as designed, this is a classic circumstance which calls for a jury to resolve credibility determinations and questions of fact. *See Wojcik v. Empire Forklift, Inc.*, 14 A.D.3d 63, 65 (3d Dept. 2004) (holding that competing expert reports on design defect claim "created a question of fact to be resolved by the trier of fact").

With respect to NMHG's assertion that Saint-Gobain's removal of the LBE constituted a "material alternation" of the Yale Forklift at issue, the Court is compelled by *Lopez v. Precision Papers, Inc.*, 107 A.D.2d 667 (2d Dept. 1985) ("*Lopez I*"), *aff'd*, 67 N.Y.2d 871 (1986) ("*Lopez II*", to reject this argument. In *Lopez I*, the defendant-forklift manufacturer sought summary judgment on the grounds that the overhead guard on the forklift operated by the plaintiff at the time of the accident had been removed by his employer. Relying on *Robinson v. Reed-Prentice*, the defendant argued that this constituted a negligent alteration and absolved it from liability. *Lopez*, 107 A.D.2d at 668. In *Robinson*, the Court of Appeals held that "[m]aterial alternations at the hands of a third party which work a substantial change in the condition in which the product was sold by destroying the functional utility of a key safety feature, however foreseeable that modification may have been, are not within the ambit of a manufacturer's responsibility." 49 N.Y.2d at 481. Finding that the facts in *Lopez I* were distinguishable from *Robinson*, the court in *Lopez I* held that "the ease with which the overhead guard could be removed and the forklift's added versatility when operated without the guard" created a question of fact to be resolved by a jury. *Lopez I*, 107 A.D.2d at 669 (citations omitted). Similarly, in the present matter, there is

sufficient evidence from which a reasonable jury could conclude that the Yale Forklift "was purposefully manufactured to permit its use without the [LBE]." *Lopez II*, 67 N.Y.2d at 873.

Based on the foregoing, the Court denies NMHG's motion for summary judgment as to Gaudette's and Saint-Gobain's design defect claims.

### b. Failure to warn

It is well-settled that "[w]here liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent." *Estrada v. Berkel Inc.*, 14 A.D.3d 529, 530 (2d Dept. 2005) (quotation and citation omitted). Under New York law, "[a] manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998) ("*Liriano I*") (citing *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297 (1992)). A plaintiff must show a breach of that duty and "that the failure to warn was the proximate cause of his [or her] injury." *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 442 (E.D.N.Y. 2005) (citations omitted); *see also Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974 (1988). Thus, to make out a *prima facie* case in negligence and strict liability, a plaintiff asserting a failure to warn claim must establish that (1) the manufacturer had a duty to warn, *i.e.*, it knew or should have known of latent dangers resulting from intended or reasonably foreseeable unintended uses of the product; (2) the plaintiff used the product in a reasonably foreseeable manner; and (3) the manufacturer's failure to provide a warning was the cause of the plaintiff's harm. *See Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 485-86 (S.D.N.Y. 2004) (citation omitted); *see also Liriano I*, 92 N.Y.2d at 237 (citations omitted).

"In New York, there is a presumption that a user would have heeded warnings if they had been provided and that the injury would not have occurred." *Henry v. Rehab Plus Inc.*, 404 F.

Supp. 2d 435, 442 (E.D.N.Y. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). Moreover, "[a] defense to liability for failure to warn exists when the injured party had actual knowledge of the danger." *Id.* (citations omitted).

It is well-settled that a manufacturer has a duty to warn (1) "against latent dangers resulting from foreseeable uses of its product of which it knew or should have known," and (2) "of the danger of unintended uses of a product provided these uses are reasonably foreseeable." *Liriano I*, 92 N.Y.2d at 237. "Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment concerning all the circumstances." *Billiar v. Minn. Mining and Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980) (citing *Rainbow v. Albert Elia Bldg. Co.*, 49 A.D.2d 250, 253 (4th Dept. 1975) ("[R]ecovery [under a failure to warn theory] ultimately depends upon a subjective determination by the trier of the facts of what constitutes reasonable warning under all the circumstances") and *Young v. Elmira Transit Mix, Inc.*, 52 A.D.2d 202, 205 (4th Dept. 1976)). Moreover, the New York State Court of Appeals has described the standard for evaluating "failure-to-warn" liability as "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Liriano I*, 92 N.Y.2d at 243. Given this fact-intensive inquiry, as the Second Circuit has emphasized, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (citing *Beyrle v. Finneron*, 199 A.D.2d 1022, 1023 (4th Dept. 1997)); *see also Liriano v. Hobart Corp.*, 132 F.3d 124, 131 (2d Cir. 1998) ("*Liriano II*") (stating that the courts have "squarely h[e]ld that it is up to the jury to decide whether the manufacturer, in fact, has a duty to warn").

There are circumstances, however, where failure to warn claims can be decided as a matter of law: (1) "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious"; or (2) where the hazards are "patently dangerous or pose open and obvious risks." *Liriano I*, 92 N.Y.2d at 241.

NMHG argues that Gaudette and Saint-Gobain have not raised a challenge to the adequacy of the warnings associated with the Yale Forklift, because Mr. Eckstine admitted the warnings did not violate any industry standards and acknowledged that his report contains no criticism of any particular warning. *See* Dkt. No. 55-2 at 20. Moreover, NMHG contends, Gaudette and Saint-Gobain cannot demonstrate that NMHG's allegedly inadequate warnings were the proximate cause of Gaudette's injuries because Mr. Morin of Saint-Gobain did not read the operator's manual or warning sticker. *See id.* at 20-21.

Contrary to NMHG's arguments, Gaudette and Saint-Gobain have put forth sufficient evidence to create questions of fact to defeat NMHG's motion for summary judgment on these claims. Gaudette and Saint-Gobain have presented evidence sufficient for a reasonable jury to conclude that removal of the LBE to operate the Yale Forklift was reasonably foreseeable and presented the risk that the forks could fall off the end of the fork carriage. In his expert report, Mr. Eckstine stated that the Yale Forklift came with no warnings "stating that the load backrest extension should be in place when the forks are adjusted to widen their placement on the carriage in order to prevent the forks from falling off the carriage beam." Eckstine Report ¶¶ 69-70. Mr. Eckstine also asserted that NMHG began including a warning label alerting users to the danger of removing the LBE on its forklifts two years after the Yale Forklift at issue was manufactured, and never issued any post-manufacturing safety bulletins or product notices to that effect for the Yale

Forklift.  *Id.* ¶¶ 73-75.  Although neither Gaudette nor Mr. Morin read the warnings provided, Mr. McGlynn, Saint-Gobain's maintenance engineer, testified that he did read the warning labels and understood the LBE to be optional equipment.  McGlynn Dep. at 24-25.

It is worth noting that the fact that neither Gaudette nor Mr. Morin read the operator's manual or on-product warning labels is not dispositive under New York law in connection with a failure to warn claim.  "First, a plaintiff may be able to argue that the warnings, in addition to being substantively inadequate, were insufficiently conspicuous or prominent and, thus, be able to overcome his or her failure to read them."  *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d. 167, 181 (E.D.N.Y. 2008) (citations omitted); *see also Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 568 (S.D.N.Y. 2005) ("While it is true that, in many cases, a plaintiff who admits that he failed to read a warning that was issued with the product will have failed to show that any deficiency in that warning was the proximate cause of his injuries, plaintiff's failure to read an insufficiently conspicuous or prominent warning will not necessarily defeat the causation element of a failure to warn claim.") (citations omitted); *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 443 (S.D.N.Y. 1999) ("[T]he location and conspicuousness of the warnings (whether that be based on label or letter size, color, or other attributes of conspicuousness), and the role those factors played in the plaintiff's failure to read them, as well as the content and clarity of those warnings, are disputed issues in this case, and the plaintiff's failure to read the warnings should not, in and of itself, prevent the 'failure to warn' claim from going before the jury.") (citations omitted); *German v. Morales*, 24 A.D.3d 246, 247 (1st Dept. 2005) ("A jury could reasonably conclude, on the basis of the warnings that the expert asserts should have been included on the label, that the warnings that were included were inadequate and inconspicuous.  Under such

circumstances, a manufacturer who provides insufficient warnings cannot avoid liability solely because the plaintiff did not read the warnings that were provided.") (citation omitted).

"Second, a plaintiff also may be able to prevail under New York law with respect to his failure to warn claim, even though it is undisputed that he failed to read the warnings, if he can demonstrate that adequate warnings would have come to the attention of a third party, such as fellow workers or an employer, and they would have informed him of those warnings." *Humphrey*, 556 F. Supp. 2d at 181-82 (citations omitted).

In the present matter, as discussed above, Gaudette and Saint-Gobain have cited to alleged inadequacies in the substance of the warnings and to their conspicuousness, including the failure to include a warning against removal of the LBE when adjusting the width of the forks in the manuals or on the forklift itself. Moreover, Mr. Eckstine notes that NMHG began providing such a warning two years after the Yale Forklift at issue was manufactured, but did not provide any post-sale product updates to purchasers of the product. In short, these factual issues as they relate to the substance and conspicuousness of the warnings, and whether another Saint-Gobain employee would have conveyed to Mr. Morin or Gaudette any additional warnings that should have been utilized to make the warnings adequate, preclude granting NMHG's motion for summary judgment.

Based on the foregoing, the Court denies NMHG's motion for summary judgment as to this claim.

### 3. *Plaintiff's breach of warranty claims*

NMHG argues that Plaintiff's breach of warranty claims are time-barred. It appears that Plaintiff agrees that this claim should be dismissed as a matter of law. In his Statement of Material Facts, Plaintiff admits this legal conclusion. *See* NMHG SOMF ¶ 118 ("Any breach of

warranty claims arising out of the sale of a product in 1977 had expired long before commencement of the subject action."); Dkt. No. 57-1 ¶ 117[8] ("Admitted"). The Court interprets this as an indication that the parties have reached a mutual understanding that these claims should be dismissed.[9] In any event, Plaintiff has abandoned these claims by failing to address this issue in his Memorandum of Law in Opposition to NMHG's Motion for Summary Judgment, Dkt. No. 57-2. *See Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 475 n.16 (E.D.N.Y. 2012) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Accordingly, NMHG's motion for summary judgment and dismissal of these claims is granted.

### 4. *Saint-Gobain's contractual indemnification claim*

Saint-Gobain has alleged, upon information and belief, that NMHG received a purchase order for the Yale Forklift which required NMHG to indemnify Saint-Gobain "from any and all claims for personal injury or property damage arising from the forklift's performance." Dkt. No. 15 ¶¶ 14-15 (Saint-Gobain's unverified Amended Answer with Cross-Claims). NMHG states that Saint-Gobain has not produced the purchase order substantiating these allegations. NMHG argues that it is therefore entitled to summary judgment on Saint-Gobain's contractual indemnification claim. *See* Dkt. No. 55-2 at 17. Saint-Gobain does not address this argument in its opposition papers or offer any proof that a contract exists. Thus, the Court may treat this claim

---

[8] The paragraphs in Plaintiff's Statement of Material Facts are misnumbered beginning with paragraph 14, so that Plaintiffs paragraph 14 responds to NMHG's paragraph 15, and so on.

[9] The Court would of course prefer a clearer expression of such agreement, such as a stipulation and proposed order, in advance of the deadline for filing dispositive motions.

as abandoned for Saint-Gobain's "fail[ure] to address the argument in any way." *Dell's Maraschino Cherries Co.*, 887 F. Supp. 2d at 475 n.16 (citing *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003). Saint-Gobain*'s* claim also fails on the merits since it has not proffered any evidence, either by sworn statement or written document, to show that a valid contract existed or that the alleged contract contained terms requiring NMHG to indemnify Saint-Gobain.

Accordingly, NMHG's motion for summary judgment and dismissal of this claim is granted.

## C. FedEx's motion for summary judgment & Saint-Gobain's cross-motion to strike or for leave to file a sur-reply

FedEx argues that it is entitled to summary judgment on Saint-Gobain's third-party claims on the grounds that it owes no duty of defense or indemnification to Saint-Gobain. According to FedEx, the TSA is unambiguous and the plain language fails to support Saint-Gobain's claim. First, FedEx contends that the TSA does not require FedEx to indemnify or defend Saint-Gobain for Saint-Gobain's own negligence. Second, as to its duty to defend, FedEx argues that scope of such a duty is determined from the face of the allegations of the complaint – here, Plaintiff Gaudette's Amended Complaint. Since that complaint contains no allegations regarding Gaudette's own negligence or the negligence of FedEx, FedEx has no duty to defend Saint-Gobain. FedEx's motion does not address Saint-Gobain's common law claims for indemnification and contribution. *See* Dkt. No. 59-2.

In response, Saint-Gobain asserts that the TSA unambiguously requires FedEx to indemnify and provide a defense to Saint-Gobain "for any loss or claim made against Saint-Gobain resulting from FedEx's or its employees' negligent acts." Dkt. No. 60-2 at 3. Saint-Gobain claims that the undisputed facts demonstrate that Gaudette and FedEx were themselves

negligent. As to the scope of the duty to defend, Saint-Gobain argues that it is to be determined by the substance of the allegations, not solely by the choice of words in the complaint. Since "the substance of Plaintiff's claims against Saint-Gobain unquestionably show that Plaintiff, while acting within the scope of his employment [for FedEx], was negligent," FedEx has a duty to defend Saint-Gobain under the TSA. Saint-Gobain further asserts that FedEx has not moved to dismiss its common law claims for indemnity and contribution, which are distinct from its claims made pursuant to the TSA, and those claims should therefore proceed to trial. Last, Saint-Gobain argues that, pursuant to Fed. R. Civ. P. 56(d), it should be permitted to pursue a deposition of FedEx, despite the fact that the discovery period has closed in this case. According to Saint-Gobain, this deposition is necessary to determine "FedEx's understanding of the TSA" and "what facts FedEx is relying upon to argue that Plaintiff's scope of employment did not include his undeniably negligent actions that caused his own injuries." Dkt. No. 60-2 at 22.

In its reply brief, FedEx argues that no duty to defend can arise, even if the allegations in Plaintiff Gaudette's complaint do not control, until such time as there is a finding of negligence as to FedEx or its employee. FedEx also claims, for the first time in reply, that it is also entitled to summary judgment on Saint-Gobain's common law indemnity and contribution claims under New York Workers' Compensation Law Section 11, since Gaudette has not suffered a "grave injury." FedEx opposes Saint-Gobain's Rule 56(d) application for further discovery, arguing that Saint-Gobain should not be excused from its own failure to pursue discovery or seek an extension of the discovery deadline. Moreover, FedEx argues that the facts Saint-Gobain seeks will not alter this Court's analysis because both parties agree that the TSA is unambiguous (although they disagree on its meaning) and both parties agree that Plaintiff was acting in the scope of employment when the accident occurred. *See* Dkt. No. 64.

In its motion to strike, Saint-Gobain objects to FedEx's failure to plead New York Workers' Compensation Law Section 11 as an affirmative defense in its answer to Saint-Gobain's third-party complaint, or to specifically raise that argument in its motion for summary judgment. Such failures constitute a waiver of that defense or, at a minimum, a waiver of that argument for the purposes of FedEx's summary judgment motion, Saint-Gobain argues. In the alternative, Saint-Gobain seeks leave to file sur-reply papers to address FedEx's Workers' Compensation Law defense and offer proof on the issue of whether Gaudette suffered a "grave injury." *See* Dkt. No. 65-1.

### 1. FedEx's motion for summary judgment on Saint-Gobain's contract-based claims

In this diversity action, the Court applies New York's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In New York, "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). Neither party has alleged fraud or violation of public policy. At the time the TSA was executed, FedEx Freight System, Inc. had offices in Memphis, Tennessee. *See* TSA. Moreover, the parties agree the TSA is to be interpreted under the Tennessee law. *See* Dkt. No. 59-2 at 4; Dkt. No. 60-2 at 6. Accordingly, the Court will enforce the parties' agreement to be governed by Tennessee law.

Under Tennessee law, as under New York law, the initial interpretation of a contract is a matter of law for the court to decide. *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 147 (Tenn. Ct. App. 2001). In resolving disputes concerning contract interpretation, the court's task is to "ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). In doing so,

the court must first "determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). Under Tennessee law, when the terms of a contract are unambiguous, the interpretation of that contract is a matter of law for the court to decide. *Planters Gin*, 78 S.W.3d at 890.

Contract language is not ambiguous when it has a definite and precise meaning that is unattended by the danger of misconception. *Id.* Terms of a contract are not deemed ambiguous solely because the parties, as in the instant case, urge different meanings for the terms. *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2002). If the language of a contract unambiguously conveys the parties' intent, extrinsic evidence may not be considered for interpretation. *Planters Gin*, 78 S.W.3d at 890.

"The majority rule among American jurisdictions is that indemnifying a party for its own negligence is extraordinary risk shifting and such agreements must be regarded as exceptional rather than usual in the majority of business transactions." *Phoenix Ins. Co. v. Estate of Gainer*, No. M2007-01446-COA-R3-CV, 2008 WL 5330493, *7 (Tenn. Ct. App. Dec. 19, 2008) (citations omitted). "The U.S. Supreme Court noted its support for this widely accepted princip[le] stating that a contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties.'" *Id.* (quoting *U.S. v. M.O. Seckinger, Jr.*, 397 U.S. 203, 211 (1970)).

Tennessee has long adhered to the majority rule. *Id.* "Under Tennessee law, contracts that indemnify a party against one's own negligence, while not against public policy, must state that intent in expressly clear and in unequivocal terms.'" *Id.* (citing *Kellogg Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 474 (Tenn. 1973); *Kroger Co. v. Giem*, 387 S.W.2d 620, 626 (Tenn. 1965)).

"'Mere general, broad, and seemingly all inclusive language' is not sufficient to impose liability for the negligence of the indemnitee.'" *HMC Techs. Corp. v. Siebe, Inc.-Robertshaw Tenn. Div.*, No. E2000-01093-COA-R3-CV, 2000 WL 1738860, *2 (Tenn. Ct. App. Nov. 27, 2000) (quoting *Wajtasiak v. Morgan County*, 633 S.W.2d 488, 490 (Tenn. Ct. App. 1982)). As the Tennessee Court of Appeals stated in *Wajtasiak v. Morgan County*, 633 S.W.2d 488, 490 (Tenn. Ct. App. 1982), "[a]s other courts have often noted, if negligent acts of the indemnitee are intended to be included in the coverage, it would only take a few seconds for the attorneys to use appropriate express language such as 'including indemnitees' acts of negligence.'" As such, "'[a] contract of indemnity purporting or claimed to relieve one from the consequences of his failure to exercise ordinary care must be strictly construed.'" *Kellogg Co.*, 496 S.W.2d at 474 (quoting 41 Am. Jur. 2d Indemnity § 13).

Here, the terms of the TSA's indemnification clause are unambiguous. The Court finds that the TSA's broad language – that each party agreed to indemnify the other against "any and all, claims, demands, losses, damages, costs and expenses . . . arising out of the Indemnifying Party's (or its employees' or agents') negligent acts or omissions" – to be insufficient to indemnify Saint-Gobain for its own negligence. Courts in Tennessee have rejected similar arguments in several cases. *See e.g.*, *Wells ex rel. Baker v. State*, No. W2012-00189-COA-R3-CV, 2013 WL 5568386, *9 (Tenn. Ct. App. Oct. 8, 2013); *First Am. Nat'l Bank v. Tenn. Gas Transmission Co.*, 428 S.W.2d 35, 39 (Tenn. 1967) (holding that a contractual agreement to "assume the defense of . . . all claims of any kind" was "too general to include damages from negligent acts of the indemnitee"); *Phoenix Ins. Co.*, 2008 WL 5330493, at *8 (finding insufficient to indemnify for landlord self-negligence, a provision to indemnify the landlord against "all expenses, liabilities and claims of every kind"); *HMC Techs. Corp.*, 2000 WL 1738860, at *3 (finding insufficient to

indemnify for self-negligence, a provision to hold harmless against "any claim of injury due to either the normal operation or the misuse of the proposed machinery").

Saint-Gobain attempts to distinguish the circumstances present here from the general rule under Tennessee law that to contractually indemnify for one's own negligence, the contract must clearly and unequivocally express such an intention. Saint-Gobain argues that since it has taken the position in this litigation that Gaudette was contributorily negligent for his injuries, FedEx's duty to indemnify is triggered by virtue of the language in the TSA requiring such indemnification for claims "arising out of the Indemnifying Party's (or its employees' or agents') negligent acts or omissions." The Court is unpersuaded by Saint-Gobain's argument.

The case of *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244 (Tenn. Ct. App. 2002), is particularly instructive on this point. In *Pitt*, the general contractor, Tyree, signed a sub-contract with Pitt for performance of certain excavating work at a construction site. Another sub-contractor, Suess, likewise signed a sub-contract with Tyree for the performance of certain concrete work at the same construction site. Both contracts contained an identical indemnification provision which provided:

> 12. Indemnification. Subcontractors agrees, (sic) to the fullest extent permitted by law, to defend, indemnify and hold harmless, the Contractor (including the affiliates, parents and subsidiaries, their agents and employees) and other Contractors and Subcontractors and all of their agents and employees and when required by the Contractor, by the Contractor documents, the Owner, the Architects' consultants, agents and employees from and against all claims, lawsuits, damages, loss and expenses, including but not limited to attorney fees, rising out of or resulting from the performance of the Subcontractor provided that:
>
> > (a) Any such claim, lawsuit, damage, loss, or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Subcontractor's work itself) including the loss of use resulting

therefrom, to the extent caused or alleged to be caused in whole or part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by the Subcontractor or for anyone for whose act the Subcontractor may be liable, regardless of whether it is caused in part by a party indemnified hereunder; and

(b) Any such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this agreement.

*Pitt*, 90 S.W.3d at 245-46.

Suess suffered personal injuries while on the construction site when an excavator operated by Pitt backed over him. Thereafter, Suess filed a personal injury complaint against, *inter alia*, Pitt and Tyree, seeking damages he suffered as a result of the defendants' negligence. Tyree, in turn, demanded that Pitt assume Tyree's defense and indemnify Tyree in accordance with the indemnification provision. Pitt then "tendered the defense of Suess's personal injury action to Suess and demanded indemnification with respect to all claims in Suess's personal injury lawsuit pursuant to the indemnification provision above which is contained in the sub-contract between Suess and Tyree." *Id.* at 246.

Finding the contract language to be unambiguous, the court in *Pitt* held that

[t]he application of indemnity is limited to a claim that is caused or allegedly caused by Suess or anyone for whose act Suess may be liable. It is implicit from this provision of the contract that only claims made against Suess, Pitt or Tyree are included in the indemnity provision. We must respectfully disagree with the trial court's holding that a claim by Suess against Pitt and Tyree would be included in the indemnity provision. The use of the language "alleged to be caused" by Suess's negligence indicates that it is to be some claim made against Suess, Pitt, or Tyree because of some act on the part of Suess.

> We find nothing ambiguous about the language of the indemnity
> agreement. Simply stated, it means that if, because of Suess's
> negligent performance of his obligation under the contract a claim
> is made against Tyree or Pitt, Suess must indemnify those parties.
> There is certainly nothing in the language of this indemnity
> agreement that clearly and unambiguously indemnifies Tyree and
> Pitt for their own negligence.

*Id.* at 254.

In the present matter, the Court finds that the indemnification provision in the TSA, much like the language in *Pitt*, provides indemnification for claims made against Saint-Gobain as a result of the negligence of FedEx (and vice versa). Just as in *Pitt*, however, claims made by a FedEx employee against Saint-Gobain as a result of Saint-Gobain's negligence are not included in the indemnification provision.

Saint-Gobain also argues that, "at a minimum, Saint-Gobain is entitled to a defense against Plaintiff's claims and indemnification for at least the percentage of fault attributable to the Plaintiff's and FedEx's own negligence in causing the Plaintiff's alleged injuries." Dkt. No. 60-2 at 6. Saint-Gobain's argument is misplaced. To the extent that Gaudette and/or FedEx are determined to have been contributorily negligent in causing Gaudette's injuries, such a determination will be made by a jury. *See Mejia v. Manzur*, No. 10-CV-3342, 2011 WL 4916698, *2 (E.D.N.Y. Oct. 14, 2011) (noting that "where, as here, there are multiple defendants asserting cross-claims pursuant to one another for comparative negligence pursuant to section 15-108 of New York's General Obligation Law, the question of apportionment is an aspect of liability and a determination for the jury"). Saint-Gobain has filed cross-claims against NMHG and third-party claims against FedEx, and will of course argue Gaudette's contributory negligence. It is these mechanisms that will protect Saint-Gobain against liability for the negligence of others. The indemnification provision of the TSA affords no such protection.

### a. Saint-Gobain's Rule 56(d) motion for further discovery

According to Rule 56(d) of the Federal Rules of Civil Procedure, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). The party filing the affidavit pursuant to Rule 56(d) must show "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolff & Abramson, LLP*, 321 F.3d 292, 303 (2d Cir. 2003).

Saint-Gobain has submitted an affidavit providing the necessary information under Rule 56(d), and describing a series of events explaining why it did not pursue the requested discovery in this case. *See* Dkt. No. 60 ¶¶ 8-22. However, Saint-Gobain cannot avoid the fact that the court issued an order on September 24, 2012, setting a March 22, 2013, deadline for the completion of discovery, and further extended that deadline on February 15, 2013, to June 21, 2013. If Saint-Gobain was unable to meet the discovery deadline, it should have sought an extension of time. *See Back9 Network, Inc. v. Althounian*, No. 3:12-CV-00582, 2013 WL 3357715, *2 (D. Conn. July 3, 2013). "A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Burlington Coat Factory Warehouse v. Esprit de Corp.*, 769 F.2d 919, 928 (2d Cir. 1985). Thus, Saint-Gobain's request fails to justify its efforts to obtain the discovery and why those efforts failed.

Saint-Gobain's Rule 56(d) request also fails because "a mere hope of the nonmoving party that more evidence will develop is insufficient to justify denying summary judgment; instead, the discovery sought must be reasonably likely to be of use in resisting the motion." *Sanders v. Quikstak, Inc.*, 889 F. Supp. 128, 132 (S.D.N.Y. 1995). Since the Court has found the TSA to be unambiguous as a matter of law and is enforcing it according to the plain meaning of its terms, evidence regarding FedEx's "understanding" of the indemnification provision is irrelevant. Discovery into whether Plaintiff was acting in the scope of his employment with FedEx when he was injured is likewise unnecessary, since this fact is undisputed. Accordingly, Saint-Gobain has failed to demonstrate how the additional evidence sought would create a genuine issue of material fact.

For the foregoing reasons, FedEx's motion for summary judgment on Saint-Gobain's contract-based claims against it is granted.

### 2.       Saint-Gobain's motion to strike or for leave to file a sur-reply

It is well-settled that arguments raised for the first time in a reply memorandum are waived and need not be considered. *See, e.g.*, *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 169 (2d Cir. 2006); *Mateo v. Bristow*, No. 12 Civ. 5052(RJS), 2013 WL 3863865, *8 (S.D.N.Y. July 16, 2013) (collecting cases). Although "new issues may not be raised for the first time in reply," *Sabre v. First Dominion Cap.*, LLC, No. 01-CV-2145 (BSJ) (HP), 2002 WL 31556379, *3 (S.D.N.Y. Nov. 15, 2002), "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party," *Kowalski v. YellowPages.com. LLC*, No. 10–CV–7318 (PGG), 2012 WL 1097350, *10 (S.D.N.Y. Mar. 31, 2012).

Here, FedEx did not argue in its opening motion for summary judgment that Saint-Gobain's common law contribution and indemnification claims should be dismissed. FedEx raised the argument that it is entitled to summary judgment on such claims for the first time in its reply. FedEx does not contend that this new argument was made in response to new material issues raised by Saint-Gobain in its opposition papers. Instead, FedEx points to language in its moving papers which it claims indicated that it sought dismissal of Saint-Gobain's entire complaint against it. *See* Dkt. No. 66 at 14 ("the motion requested summary judgment 'dismissing this action in its entirety as against the moving third party defendant pursuant to Rule 56(b) of the Federal Rules of Civil Procedure'"). However, FedEx failed to specifically argue for dismissal of Saint-Gobain's common law claims, instead focusing its moving papers on arguments for the dismissal of Saint-Gobain's contract-based claims. Thus, Saint-Gobain did not have notice of FedEx's arguments that the common law claims were barred under the New York Workers' Compensation Law Section 11, and therefore did not have a full and fair opportunity to respond. *See Vilkhu v. City of New York*, No. 06-CV-2095, 2008 WL 1991099, *8 (E.D.N.Y. May 5, 2008) (declining to consider the defendants' argument that they were entitled to qualified immunity because the defendants raised this argument for the first time in their reply papers). Accordingly, Saint-Gobain's motion to strike FedEx's arguments seeking dismissal of Saint-Gobain's common law indemnification and contribution claims is granted.

Saint-Gobain also argues that FedEx has waived its argument under New York Workers' Compensation Law Section 11, for failure to plead it as an affirmative defense. The Court declines to consider this issue at this time. Saint-Gobain's motion to strike is limited to the issue of whether the Court should consider FedEx's new arguments raised for the first time in reply.

The deadline for filing dispositive motions has passed. Saint-Gobain cannot now seek a ruling precluding FedEx from asserting an affirmative defense.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that NMHG's motion to preclude the testimony of Dennis Eckstine is **DENIED**; and the Court further

**ORDERS** that NMHG's motion for summary judgment is **GRANTED in part** and **DENIED in part**[10]; and the Court further

**ORDERS** that FedEx's motion for summary judgment is **GRANTED in part** and **DENIED in part**[11]; and the Court further

**ORDERS** that Saint-Gobain's motion to strike is **GRANTED** and Saint-Gobain's motion for leave to file a sur-reply is **DENIED** as moot; and the Court further

**ORDERS** that the parties' counsel shall be available for a telephone conference on April 9, 2014 at 11:30 a.m. to discuss setting a trial date; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 28, 2014
Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[10] As a result of this Memorandum-Decision and Order, the claims against NMHG that remain for trial are Gaudette's and Saint-Gobain's design defect and failure to warn claims.

[11] As a result of this Memorandum-Decision and Order, the only remaining claims against FedEx are Saint-Gobain's common law contribution and indemnification claims.

Figure 1:



Figure 2:

